Trustees of Health & Hospitals of Boston, Inc. *v.* Massachusetts Comm'n Against Discrimination.

TRUSTEES OF HEALTH AND HOSPITALS OF THE CITY OF
BOSTON, INC. *vs.* MASSACHUSETTS COMMISSION AGAINST
DISCRIMINATION & others.[1]

Suffolk. April 5, 2007. - August 10, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Administrative Law,* Judicial review, Agency's interpretation of statute, Substantial evidence. *Anti-Discrimination Law,* Termination of employment, Prima facie case, Attorney's fees. *Employment,* Discrimination, Termination. *Damages,* Attorney's fees. *Practice, Civil,* Attorney's fees, Appeal.

In a civil action seeking review of a decision of the Massachusetts Commission Against Discrimination that the employer had unlawfully discriminated against the complainants on the basis of their race and gender in terminating their employment, substantial evidence existed that the complainants and another terminated employee were similarly situated in all relevant aspects of the manner in which layoffs were effectuated, and the judge erred in entering judgment on the pleadings in favor of the employer on the ground that the complainants and the other employee were not similarly situated for purposes of implementation of the employer's layoff procedure. [681-685]

In a civil action alleging employment discrimination on the basis of race and gender, strong evidence of discriminatory animus existed, where the employer instituted a procedure that was to be used for all employees being laid off, but the procedure was fully implemented only against African-American women employees, and in a particularly harsh manner; and where the employer's proffered reason for its disparate treatment was not credible. [685-688]

This court permitted complainants in an employment discrimination action to seek attorney's fees and costs with respect to proceedings in this court; further, this court allowed the complainants to seek such fees and costs from the Appeals Court with respect to the proceedings of this case in that court, despite the fact that the complainants had not requested such fees and costs in their brief in the Appeals Court. [688-689]

CIVIL ACTION commenced in the Superior Court Department on June 19, 2002.

[1]Gloria Coney, Belinda Chambers, Victoria Higginbottom, Marlene Hinds, and Betty Smith.

The case was heard by *Thomas E. Connolly*, J., on motions for judgment on the pleadings.

After review by the Appeals Court, the Supreme Judicial granted leave to obtain further appellate review.

*Anne L. Josephson* (*Marc L. Breakstone* with her) for Gloria Coney.

*Christine M. Hayes* (*John M. Townsend & Fatema Fazendeiro* with her) for the plaintiff.

*Martin S. Ebel*, for Massachusetts Commission Against Discrimination, was present but did not argue.

*Kelly M. Bonnevie*, for Veronica Higginbottom & others, was present but did not argue.

*Patricia A. Washienko & Rebecca G. Pontikes*, for American Civil Liberties Union of Massachusetts & others, amici curiae, submitted a brief.

SPINA, J. The Massachusetts Commission Against Discrimination (MCAD) adopted a hearing commissioner's determination that the Trustees of Health and Hospitals of the City of Boston, Inc. (Trustees), unlawfully discriminated against the five individual complainants on the basis of their race (African-American) and gender (female) by subjecting them to harsh treatment in the implementation of layoffs on July 19 and 20, 1994[2]; and awarded them damages for emotional distress, plus attorney's fees and costs. The Trustees sought judicial review under G. L. c. 151B, § 6. A judge in the Superior Court allowed the Trustees' motion for judgment on the pleadings, see Superior Court Standing Order 1-96, and vacated the MCAD's decision on the ground that the complainants had not established a prima facie case because, in his view, they had not shown that they were situated similarly to a Caucasian male who was laid off at the same time, but not subjected to the same harsh treatment. The Appeals Court reversed the judgment of the Superior Court and ordered entry of a judgment affirming the MCAD's decision awarding damages, fees, and costs, but it modified the MCAD decision by ordering reinstatement of the hearing commissioner's award of prejudgment interest. *Trustees*

---

[2]The complainants did not challenge the Trustees' selection of employees laid off, just the manner in which the layoffs were implemented.

*of Health & Hosps. of Boston, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 65 Mass. App. Ct. 329, 339 (2005). We granted the Trustees' application for further appellate review, limiting the scope of review to issues concerning whether the Trustees discriminated against the complainants. For substantially the reasons stated by the Appeals Court, we conclude that the judgment of the Superior Court must be vacated.[3] We also conclude that the complainants are entitled to prevail on the merits of their claims and affirm the decision of the MCAD, as modified.

1. *Facts.* The following is a summary of the facts found by the hearing commissioner. The Trustees operated several community-based health programs in Boston, and had a central office on Massachusetts Avenue. One such program was the Healthy Baby/Healthy Child Program (HBHC) in the Hyde Park neighborhood of Boston. The five complainants were employed by the Trustees at the Hyde Park site during July, 1994, at the time they were laid off.

In the fall of 1993, Marjorie Perkins, HBHC program director, became aware of funding restrictions that would affect the program. Some time after mid-June, 1994, the Trustees assigned Teri McNamara, director of labor relations, to assist Perkins in planning a layoff of employees yet to be determined. Perkins and McNamara had numerous conversations in preparation for the layoffs. Perkins determined who would be laid off. Under the procedure to be followed, all selected employees would receive no advance notice,[4] and they would be monitored as they gathered their belongings. On July 11, 1994, Perkins sent a memorandum to one of the Trustees' upper level managers in

[3]We acknowledge the amicus curiae brief filed by the American Civil Liberties Union of Massachusetts; Black Women Attorneys, Massachusetts Chapter; Greater Boston Civil Rights Coalition; Jewish Alliance for Law and Social Action; Lawyers' Committee for Civil Rights Under Law of the Boston Bar Association; Massachusetts Lesbian and Gay Bar Association; National Employment Lawyers' Association, Massachusetts Chapter; and National Lawyers Guild, Massachusetts Chapter.

[4]The record reveals that, pursuant to the terms of the collective bargaining agreement that covered four of the complainants, the Trustees opted to provide employees with five days' pay in lieu of giving them fourteen days' advance notice of the layoffs.

which she identified eight employees, including the complain-ants, selected to be laid off.[5]

At approximately 4:30 P.M. on July 19, 1994, McNamara summoned Gloria Coney and Marlene Hinds to Perkins's office at the Hyde Park site, informed them that they were being laid off effective immediately, and that they were to leave by 5 P.M.

McNamara monitored Hinds as she packed her belongings. Hinds's daughters happened to be present and asked their mother if she was being monitored because the employer thought she might steal something. Hinds felt numb and humili-ated during the process. She felt she had been treated like a common thief in the presence of her daughters and coworkers. One of her daughters had to take her home because she was in no condition to drive. She was treated by a physician for result-ing problems.

Coney's departure was monitored by Steve O'Brien. He inspected her belongings as she packed, and he grabbed her lunch bag to inspect its contents. Perkins was present part of the time, and she examined Coney's lunch bag. O'Brien told Coney she could remove nothing issued by the Trustees. Coworkers cried as they looked on and asked if Hinds and Coney were be-ing taken to jail. Coney felt humiliated, mortified, and angry at being treated like a criminal. She did not have an opportunity to say goodbye to her coworkers because she had to go to her second job. She obtained permission to return and finish pack-ing the next day, which she did while being monitored by Jac-queline Nolan, associate director of the HBHC program. She cried "all night long," feeling that her employer had acted on a presumption "that black women steal things" and had treated her accordingly. When she learned that Christopher Navin, a white male who also was laid off, had not been monitored while he gathered his belongings and was allowed to move about the building freely, she felt angry and "lower than low."

Victoria Higginbottom, Belinda Chambers, and Betty Smith did not work on July 19, 1994. As with Hinds and Coney, the

---

[5]The record shows that one such employee, Alicia Hill, was a secretary who worked in the central office. She is of Venezuelan ancestry, and she was not monitored as she gathered her belongings. Another was a city of Boston employee assigned to the Trustees.

Trustees had not given them advance notice of the layoffs. On the morning of July 20, 1994, McNamara summoned Higginbottom, Chambers, and Smith to Perkins's office and told them they were being laid off, effective immediately. Marcus DeFlorimonte monitored Higginbottom as she packed her belongings while coworkers looked on. She felt degraded and "stripped of her dignity," a source of stress that exacerbated a preexisting medical problem and contributed to a new problem that required surgery.

Smith was monitored by O'Brien as she gathered her personal effects. She was unable to pack all her belongings and had to leave photographs and certificates behind. She was too upset to return and retrieve those items later. She felt deeply disturbed, humiliated, and saddened by the manner in which she was laid off, and she received medical treatment for certain resulting problems.

McNamara stood at Chambers's desk and pulled papers out of her hands as she packed. McNamara "boss[ed]" Chambers around during the process, which took place in the presence of a coworker who shared the office with Chambers. Chambers broke down in tears. McNamara refused to allow Chambers, a full-time health advocate, to notify clients that she would not be able to keep her appointments with them that day. Only after Chambers persisted did McNamara allow her to take telephone numbers home to telephone clients. Devastated by the layoff, Chambers walked home with her belongings. She could not bear to pass by the HBHC building for years. She received medical treatment for a resulting problem.

The Trustees notified Christopher Navin, a white male employee, in advance of his layoff. In addition, the day before his scheduled layoff, either Nolan or Perkins telephoned him at home to advise him that when he reported to work the next day McNamara and DeFlorimonte would be at the office to give him his notice. He requested, for personal reasons, that DeFlorimonte not be involved, and his request was honored. When Navin reported to work on July 21, 1994, Nolan handed him his notice. He was not monitored as he cleaned out his desk, and he was permitted to walk freely through the building to say goodbye to coworkers.

The Trustees offered two reasons for treating Navin differently from the complainants: a general concern about vandalism, sabotage, and personal safety of HBHC employees; and a specific desire to ensure the integrity of confidential client records. Nolan contended that Navin was treated differently because he did not handle confidential client records. The hearing commissioner disbelieved the proffered reasons and concluded they were a pretext for discrimination. Specifically, he found that Coney, Smith, and Higginbottom, like Navin, did not handle confidential client records. In addition, he found incredible McNamara's testimony about the need to safeguard client files because in her deposition three years earlier she never stated this to be a concern except in reference to an earlier incident where some records had been mishandled by an unknown person. The hearing commissioner also found that at no time during the layoff procedure did the Trustees take steps to ensure the integrity of confidential files, such as inquiring of the complainants if they had any such files, examining the records room log books in advance of the layoffs to determine which of the complainants had taken possession of any such files, or telling the complainants they were being monitored to ensure the integrity of the client files.

The hearing commissioner also found that the Trustees had no nondiscriminatory reason to suspect that the five complainants posed a threat to the safety of any HBHC employee. Although McNamara testified that Perkins had expressed such concerns, including for her own safety, Perkins never expressed such concerns in a prior affidavit, and she expressly denied in her testimony that she had any such safety concerns. The hearing commissioner discredited McNamara's testimony on the point.

Finally, the hearing commissioner concluded that Navin was situated similarly to the complainants in all relevant aspects pertaining to the layoff procedure, and that the Trustees' managers even had determined at the time they settled on the layoff procedure that all those being laid off should be treated similarly. He concluded that the disparate treatment of the

complainants in the implementation of the layoff procedure violated G. L. c. 151B, § 4 (1).[6]

2. *Comparator evidence.* The Superior Court judge concluded that the decision of the MCAD must be reversed because, as a matter of law, the agency erroneously determined that Navin and the complainants were similarly situated for purposes of showing discrimination based on disparate treatment. The judge ruled that Navin and the complainants were not similarly situated because Navin "had a different job title and different responsibilities. Unlike some of the [complainants], Navin was not a supervisor, and he had no contact with [Trustee] clients. Navin worked part-time, rather than full-time, and he could work from multiple locations, including his home if he so desired." These differences, the judge concluded, warranted different treatment during the layoff and could not support a claim of discrimination. The complainants argue that the MCAD's decision was not erroneous because it was supported by substantial evidence that they were similarly situated to Navin in all aspects relevant to the implementation of the layoff procedure. Alternatively, they argue that a similarly situated comparator is not required in all cases, and that this is such a case.

Judicial review of a decision of the MCAD is limited. Where the issues are properly raised, we examine the administrative record to determine if the decision is supported by substantial evidence, giving deference to the fact-finding function of the commission, and we review for other error of law. *Wheelock College* v. *Massachusetts Comm'n Against Discrimination,* 371 Mass. 130, 133 (1976).

"We have construed G. L. c. 151B as containing four ele-

---

[6]General Laws c. 151B, § 4, as amended through St. 1989, c. 516, § 4, in effect during July, 1994, stated:

"It shall be an unlawful practice:

"1. For an employer, by himself or his agent, because of the race, color, religious creed, national origin, sex, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, or ancestry of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification."

ments an employee must prove to prevail on a claim of discrimination in employment: membership in a protected class, harm, discriminatory animus,[7] and causation." *Sullivan* v. *Liberty Mut. Ins. Co.*, 444 Mass. 34, 39 (2005), citing *Lipchitz* v. *Raytheon Co.*, 434 Mass. 493, 502 (2001). The structure of a discrimination case will "necessarily vary depending on the job involved and the [employment] decision to be made." *Smith College* v. *Massachusetts Comm'n Against Discrimination*, 376 Mass. 221, 230 (1978). See *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802 n.13 (1973) (first stage [prima facie case] in three-stage order of proof may not be same in every case); *Wheelock College* v. *Massachusetts Comm'n Against Discrimination*, *supra* at 135 n.5 (same).

The complainants presented their case in accordance with the so-called three-stage order of proof set forth by the Supreme Court in *McDonnell Douglas Corp.* v. *Green*, *supra* at 802-805, for Title VII cases, a model we have followed in some cases. See *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 440-441 (1995), and cases cited. Under that evidentiary paradigm, a complainant must show in the first stage that, inter alia, she was treated differently from another person, known as a comparator, who was not a member of her protected class, but who otherwise was "similarly situated." *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129 (1997). Membership in the protected class aside, a comparator's circumstances need not be identical to those of the complainant. A comparator's circumstances need only be substantially similar to those of the complainant "in all relevant aspects" concerning the adverse employment decision. *Id.*, quoting *Dartmouth Review* v. *Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989). "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. . . . Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." *Dartmouth Review* v. *Dartmouth College*, *supra*.

With respect to the complainants' alternative theory (comparators are not required in all cases), the Appeals Court correctly

---

[7]The third element is the focus of this appeal.

noted that "[a]lthough providing a similarly situated comparator is usually the most probative means of proving that an adverse action was taken for discriminatory reasons, it is not absolutely necessary." *Trustees of Health & Hosps. of Boston, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 65 Mass. App. Ct. 329, 335 (2005). See, e.g., *Sullivan* v. *Liberty Mut. Ins. Co.*, *supra* at 45 (plaintiff in reduction in force case "may satisfy the fourth element of her prima facie case by producing some evidence that her layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination"); *Knight* v. *Avon Prods., Inc.*, 438 Mass. 413, 425-426 & n.9 (2003) (in case of slight age disparity between plaintiff and "replacement," plaintiff may "present some evidence to permit the jury to find that age was a determinative cause in the termination," including "that other employees of the plaintiff's age were terminated at the same time"). The "initial burden of establishing a prima facie case is not intended to be onerous." *Sullivan* v. *Liberty Mut. Ins. Co.*, *supra*. It is meant to be a "small showing" that is "easily made." *Chungchi Che* v. *Massachusetts Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003), quoting *Kosereis* v. *State*, 331 F.3d 207, 213 (1st Cir. 2003). A complainant "must simply produce sufficient evidence that [the employer's] actions, 'if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.' " *Sullivan* v. *Liberty Mut. Ins. Co.*, *supra* at 40, quoting *Furnco Constr. Corp.* v. *Waters*, 438 U.S. 567, 577 (1978).

The judge concluded that the complainants were not similarly situated to Navin based on a comparison of their respective job "performances, qualifications and conduct," a general standard referred to in *Matthews* v. *Ocean Spray Cranberries, Inc.*, *supra* at 130, quoting *Smith* v. *Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir. 1994), cert. denied, 514 U.S. 1108 (1995). This was error. These are not relevant factors for comparison in this case. Indeed, these factors, along with others such as job duties, work site, and work shift, may be relevant when devising differences in layoff procedures. But that already had been done in this case by the Trustees when its managers determined that *all* employees being laid off would receive no notice and be monitored while they gathered their belongings, essentially

eliminating any discretion in layoff procedures based on existing job-related criteria. The judge failed to consider that the Trustees had adopted a procedure under which all employees being laid off were to be treated similarly, a fact found by the hearing commissioner based on substantial evidence. The factors applied by the judge did not have the intended effect of ascertaining potentially relevant differences in the manner in which the layoffs were conducted.[8] Instead, the effect was to rewrite, after the fact, the layoff procedure that the Trustees had chosen.

In any event, after reviewing the differences between the complainants and Navin based on the factors considered by the judge, together with the Trustees' proffered reasons for giving no advance notice and for monitoring the layoffs (vandalism, employee safety, and integrity of confidential client files), we conclude those differences were not relevant to the manner in which the layoffs were conducted. See *Matthews* v. *Ocean Spray Cranberries, Inc., supra* at 129. With respect to the question of vandalism, there was no evidence that the complainants previously had destroyed or were threatening to destroy property belonging to the Trustees. There was no evidence that the complainants themselves constituted a threat of violence, and certainly no more so than did Navin. As to the integrity of confidential client records, there had been no specific concern that any of the complainants would undermine the integrity of such records, and Coney, Smith, and Higginbottom did not even handle such records. The fact that Navin had different job duties (as did most of the complainants), had a part-time schedule, and was permitted to work at home or in another office had no bearing on whether he would vandalize or take the Trustees' property, or commit a violent act in response to his layoff.

We conclude that the judge erred by ordering judgment for the Trustees on grounds that the complainants and Navin were not similarly situated for purposes of the implementation of the Trustees' layoff procedure. We further conclude that there was

---

[8]For example, had there been evidence of an employee's illness, death of an employee's close family member, or an emergency arising at the workplace at the time of the layoffs that might support differential treatment, such factors could have been considered.

substantial evidence that the complainants and Navin were similarly situated in all relevant aspects of the manner in which the layoffs were effectuated.

Before leaving the subject of comparator evidence, we turn to the one part of the Appeals Court's opinion with which we differ in some respects. The Appeals Court concluded that "it is unnecessary to decide whether Navin was similarly situated in all relevant ways to the complainants, because regardless whether Navin was similarly situated, the record reflects that the complainants were treated worse than all potential comparators. This was enough of a showing to meet the complainants' burden." *Trustees of Health & Hosps. of Boston, Inc.* v. *Massachusetts Comm'n Against Discrimination, supra* at 335. The Trustees contend that the phrase "all potential comparators" is overbroad, ambiguous, and lowers a plaintiff's burden of proof. We agree that this particular phrase is unclear. Nevertheless, we view the phrase "all potential comparators" to mean that the court considered all employees being laid off as similarly situated by operation of the terms of the layoff procedure, as we have discussed.

3. *Sufficiency of the evidence.* The judge determined that the complainants had not made out their prima facie case (first stage) under the *McDonnell Douglas* three-stage order of proof because they failed to show they were treated differently from one who was similarly situated. Having made this ruling, the judge was not required to consider the next steps in that analytic model, namely, whether the Trustees had proffered a legitimate, nondiscriminatory reason for its actions and whether the complainants showed that the reasons were a pretext for discrimination. See *Wheelock College* v. *Massachusetts Comm'n Against Discrimination*, 371 Mass. 130, 138-139 (1976). The Appeals Court also considered only the first stage of the three-stage model, presumably because the other issues were not briefed in that court, and the parties were not required to brief any more than involved the first stage order of proof on which the judge had decided the case. The parties have now fully briefed all the issues, and they ask us to decide the case in its entirety. We have before us the full administrative record, and we are in as good a position as the Superior Court to decide

the case. See *Boston* v. *Massachusetts Comm'n Against Discrimination*, 47 Mass. App. Ct. 816, 818 n.4 (1999). This case is now thirteen years old, and a remand (with possibly another appeal) could add years to its life. The administrative reasons for deciding this fully briefed case now are compelling, and we therefore proceed to the merits of the case.

The Trustees argue that the decision of the MCAD is erroneous specifically because the complainants failed to make out a *McDonnell Douglas* prima facie case by establishing that they were similarly situated to Navin and Alicia Hill.[9] The Trustees also argue that the complainants failed to show discriminatory animus.

The four elements of the complainants' proof are (1) membership in a protected class; (2) harm; (3) discriminatory animus; and (4) causation. Comparator evidence is not specifically required. The third element is at issue here. The evidence of discriminatory animus is strong. The Trustees instituted a layoff procedure that was to be used for all employees being laid off. The procedure itself was race and gender neutral because it was to be applied to everyone alike. However, it was fully implemented only against African-American women. The procedure was executed in a particularly harsh manner. Navin, a white male, was spared both prongs of the procedure: no notice, and aggressive monitoring. Hill, a woman who is not African-American, was spared the monitoring. The fact finder readily could conclude that there was a discriminatory hierarchy in who would be spared from the layoff procedure, with white males at the top, women below them, and African-American women at the bottom. This scenario was made more graphic by the evidence, accepted by the hearing commissioner and underlying his conclusion that the reasons given by the Trustees for the disparate treatment were false, which alone permits the fact finder to infer discriminatory animus. See *Lipchitz* v. *Raytheon Co.*, 434 Mass. 493, 504 (2001).

Contrary to the argument made by the Trustees, the complain-

---

[9]See note 5, *supra*. The hearing commissioner found that Hill was not similarly situated to the complainants because she worked at a different location. The judge in the Superior Court acknowledged as much, then focused his attention on Navin.

ants were not required to follow the *McDonnell Douglas* paradigm in order to prevail. It is certainly one way to present a case, but it is not the only way. See *Knight* v. *Avon Prods., Inc.*, 438 Mass. 413, 420 n.4 (2003). The first stage of the *McDonnell Douglas* paradigm gives rise to a presumption of discrimination. See *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 128 (1997). But an inference of discrimination will suffice. See *Lipchitz* v. *Raytheon Co., supra.*

Nevertheless, application of the *McDonnell Douglas* paradigm produces a favorable result for the complainants. The complainants showed that they are members of a protected group, that they suffered an adverse employment decision (application of the layoff procedure), and that for purposes of the Trustees' layoff procedure they were similarly situated to persons who were exempted partially or wholly from that procedure. Only the last component is disputed. As we have discussed, by adopting the particular layoff procedure that all employees being laid off would be treated alike, the Trustees determined that those employees were similarly situated. This proof entitled the complainants to a presumption of discrimination. *Matthews* v. *Ocean Spray Cranberries, Inc., supra.* The burden then shifted to the Trustees to proffer a nondiscriminatory reason for its employment decision to exempt certain employees, together with "credible evidence to show that the reason or reasons advanced were the real reasons." *Wheelock College* v. *Massachusetts Comm'n Against Discrimination, supra* at 138. Although the employer's burden is not onerous, see *Matthews* v. *Ocean Spray Cranberries, Inc., supra*, it was not met in this case. The reasons proffered by the Trustees were nothing more than an attempt to rewrite, after the fact, its layoff procedure, and thus did not constitute a credible explanation for why the policy it had adopted for all employees being laid off could not be followed in this case. That should have ended the case in favor of the complainants because the proffer by the Trustees did not eliminate the presumption of discrimination under *McDonnell Douglas*. Even though the hearing commissioner entertained the proffered reasons, the presumption did not disappear. In any event, the hearing commissioner went on to determine, based on substantial evidence, that the reasons prof-

fered by the Trustees were false and a pretext for discrimination, culminating in a decision in favor of the complainants.

Even if we had concluded that the Trustees' layoff procedure effectively did not treat all the employees to be laid off as similarly situated, and even if we had concluded that the Trustees' proffer overcame the *McDonnell Douglas* presumption, which we have not done, the complainants still would prevail. There was other evidence that the complainants and Navin were similarly situated. We mention the most prominent. They all worked at the same location, even if Navin only worked there part time; three of the five complainants, like Navin, did not work with confidential files; no effort had been made in advance to determine which employee being laid off had signed out any confidential files; and there was no evidence that any of the employees being laid off was prone to violence, vandalism, or theft, or even was shown to be more so than any of the others being laid off. There was no evidence, for instance, that Coney was more likely to conceal a confidential file, which she did not even handle in the course of her job, or other property of the Trustees in her lunch bag than Navin could have concealed in a container he may have brought with him to work or could have used to remove his belongings. For purposes of these layoffs, there were no valid reasons to treat all the complainants differently from Navin.

There also was evidence of discriminatory animus, previously discussed, if only from the substantial evidence that supported the hearing commissioner's finding that the Trustees' proffered reasons were false and a pretext for discrimination. Under any analysis, the complainants are entitled to prevail.

4. *Attorney's fees.* In their brief, the complainants have requested attorney's fees and costs, and may proceed conformably with *Fabre* v. *Walton*, 441 Mass. 9, 10 (2004), with respect to the proceedings in this court. They did not make a request for such fees in their Appeals Court brief, and that brief was filed after we announced in *Fabre* v. *Walton*, *supra*, that such requests must first be made in the appellate brief, with the amount to be determined by further submissions after the case is decided. The Appeals Court nevertheless has discretion to award fees even if a party failed to request them in the brief.

*Beal Bank, SSB* v. *Eurich*, 448 Mass. 9, 12 (2006). The complainants hereby are allowed to seek their appellate fees and costs from the Appeals Court with respect to the proceedings of this case in that court.

We vacate the judgment of the Superior Court. The case is remanded for the entry of a judgment affirming the decision of the MCAD and reinstating the hearing commissioner's award of prejudgment interest.

*So ordered.*