GENIVEVE KING & others[1] vs. CITY OF BOSTON.

No. 06-P-1013.

Suffolk. October 16, 2007. - March 28, 2008.

Present: COWIN, KATZMANN, & MEADE, JJ.

*Public Employment,* Police, Collective bargaining. *Employment,* Discrimination, Retaliation. *Anti-Discrimination Law,* Sex, Prima facie case.

In a civil action alleging gender discrimination in employment brought in Superior Court by female superior police officers of the police department (department) of the city of Boston (defendant), who were aggrieved by the failure of the department to provide them with rank-specific locker rooms similar to those provided to male superior officers, the judge erred in granting summary judgment in favor of the defendant on the basis that such a benefit was not among the terms, conditions, or privileges of employment, the deprivation of which would constitute an adverse employment action under G. L. c. 151B, § 4(1), where, on the summary judgment record, a finding regarding the materiality of such a benefit could not be made as a matter of law. [466-472]

In an action brought in Superior Court by female superior police officers (plaintiffs) of the police department (department) of the city of Boston (defendant), alleging that the defendant, following the plaintiffs' complaints about the failure of the department to provide them with rank-specific locker rooms similar to those provided to male superior officers, retaliated by eliminating that benefit, the judge erred in granting summary judgment in favor of the defendant, where there was sufficient evidence to create genuine disputes of material fact whether the department's plan to eliminate the locker rooms was an adverse employment action for purposes of G. L. c. 151B, § 4(4) and (4A), and whether the plan was adopted to retaliate against male superior officers for supporting the female superior officers' complaints. [472-475]

CIVIL ACTION commenced in the Superior Court Department on February 11, 2003.

The case was heard by *Charles T. Spurlock,* J., on motions for summary judgment.

[1]Debra Jenkinson and Anne Stuart. King, Jenkinson, and Stuart purport to bring the action on behalf of all of the members of the Boston Police Superior Officers Federation (collectively, plaintiffs).

*Shannon Liss-Riordan* for the plaintiffs.

*Daniel S. McCabe, Jr.* (*Mary Jo Harris* with him) for the defendant.

*Patrick N. Bryant,* for Boston Police Patrolmen's Association, Inc., International Union of Police Associations, Local 16807, AFL-CIO, amicus curiae, submitted a brief.

COWIN, J. Plaintiffs Geniveve King, Debra Jenkinson, and Anne Stuart, each a female superior police officer[2] of the Boston police department (department), aggrieved by the failure of the department to provide female superior officers with rank-specific locker rooms[3] similar to those provided to male superior officers, commenced this action for gender discrimination on the part of the defendant, the city of Boston, see G. L. c. 151B, § 4(1), as well as for retaliation by the defendant, see G. L. c. 151B, § 4(4) and (4A).[4,5] A judge of the Superior Court determined that the failure to provide rank-specific locker rooms did not constitute an adverse employment action for purposes of either a gender discrimination claim or a retaliation claim, and that in any event the plaintiffs had failed to demonstrate a retaliatory motive on the part of the department. He concluded accordingly that the plaintiffs had failed to establish a prima facie case with respect to either claim, allowed the defendant's motion for summary judgment, denied the plaintiffs' cross motion for summary judgment, and ordered the entry of a declaratory judgment authorizing the defendant to go forward with the department's plan to eliminate altogether rank-specific locker facilities.

The plaintiffs' timely appeal brings the case here.[6] We conclude that, on the evidence presented, a fact finder permissibly

---

[2]Superior police officers are those with the rank of sergeant or above.

[3]By the term "rank-specific," we refer to the provision of one locker room for superior officers and separate locker facilities for patrol officers.

[4]In their retaliation claim, the plaintiffs alleged that the department decided to convert all locker room facilities to rank-neutral facilities in an unlawful response designed to punish the Boston Police Superior Officers Federation for supporting the claims of its female members.

[5]The plaintiffs included claims under G. L. c. 93, § 102, the Massachusetts Equal Rights Act; and for permanent injunctive relief. They have not appealed with respect to those claims.

[6]We acknowledge the amicus brief submitted by the Boston Police Patrolmen's Association, Inc., International Union of Police Associations, Local 16807, AFL-CIO.

could find that the department subjected the plaintiffs to adverse employment action, and that the department took action against the male members of the Boston Police Superior Officers Federation (federation) in retaliation for their support of the individual plaintiffs' claims. Accordingly, summary judgment could not enter with respect to the gender discrimination and retaliation claims, and we vacate so much of the judgment as dismissed those claims.[7]

1. *Background.* The underlying facts are generally undisputed. Since at least 1980, the department has provided superior officers with locker rooms in the district stations that are separate from the locker rooms made available to patrol officers. Superior officers consider the separate locker facilities a tangible benefit of their rank, and both superior officers and patrol officers view the separation as useful so that disciplinary issues and other factors relating to rank do not affect the use of the respective spaces. Nevertheless, the collective bargaining agreement between the federation (the union of uniformed civil service superior officers) and the defendant never has contained express language that requires the provision of separate superior officer locker rooms.

In April, 2000, King was promoted to the rank of lieutenant and assigned to district station B-3 in Dorchester. That station had had a locker room for female superior officers, but when the last such officer left, the locker room was assigned to the drug control unit. King complained to her commanding officer, Captain Pervis Ryans, Jr., and asked that the space be reverted to its originally designated purpose. Ryans brought King's complaint to the department's bureau of administrative services, but was unable to obtain action and informed King that the female superior officer locker room would remain occupied by the drug control unit for the foreseeable future. King first had used the male superior officers' locker room, and then used the female patrol officers' locker room. Eventually she received access to a locked closet space within the female patrol officers' locker room as a quasi superior officer locker room. She quickly

---

[7]Because we conclude only that the plaintiffs have made a prima facie showing that an adverse employment action occurred and the remainder of the plaintiffs' case must still be proved, we affirm the denial of their cross motion for summary judgment.

became dissatisfied with this compromise because she still was required to enter and traverse the female patrol officer locker room in order to get to her space. Jenkinson, who at that time was a patrol officer in B-3, also expressed her displeasure with King's use of the patrol officers' locker room, informing Ryans that she was "uncomfortable" having a superior officer in the area.

With no resolution forthcoming, King complained to the federation in January, 2001. Days later, then Sergeant Joseph Gillespie, the recently elected president of the federation, forwarded her grievance to the department's deputy superintendent, John Sullivan. Sullivan expressed sympathy with King's situation and presented the issue to the then superintendent-in-chief, James Hussey; Bill Good, director of the bureau of administrative services; and the executive rules committee, a group comprised of various department superintendents and bureau chiefs.

This group in turn requested that Mark Lynch, director of the department's facilities management division, conduct a review of all superior officer locker rooms department-wide. In a memorandum dated April 2, 2001, and addressed to Good, Lynch documented a gender disparity in the availability of superior officer locker rooms. In all eleven district stations, male superior officers received access to a superior officer locker room. In contrast, only five district stations contained a female superior officer locker room, and one of these stations, D-4, was newly constructed and not yet open. Lynch also acknowledged that the female superior officer locker room at B-3 (King's station) remained in use by the drug control unit, thereby reducing the number of district stations with locker rooms assigned to female superior officers to four.

A few days later, Good met with the department's commissioner, Paul Evans, and recommended the elimination of all male and female superior officer locker rooms. Evans agreed and ordered that implementation of this policy begin with the imminent opening of district station D-4. The defendant admits that the department had not considered the establishment of what is essentially a rank-neutral locker room policy prior to this time. The defendant concedes as well that the recommendation was adopted without determining whether the drug control unit could

be moved to accommodate King's request in B-3, whether physical space was available in district stations that lacked a female superior officer locker room so that renovations could be made to satisfy the need, or whether renovations of such a nature could be undertaken at a reasonable cost.

Later in April, 2001, the federation became aware of the department's intention to eliminate all rank-specific locker rooms. By a letter dated April 17, 2001, sent to Michael P. Reagan, director of the department's office of labor relations, Lieutenant Thomas W. Nolan (the federation's vice-president) objected to the plan made "apparently in response to the Federation's inquiry regarding the failure of the Department to maintain separate facilities for male and female superior officers at the B-3 station." He stated further that the federation viewed the elimination of rank-specific locker rooms as "a change in working conditions and the mandatory subject of collective bargaining." On April 30, 2001, Evans agreed, at the federation's request, to preserve the superior officer locker rooms in the new station D-4 until the issue was fully bargained between the parties.

On May 10, 2001, T. Martin Roach, Jr., a department labor counsellor, wrote a letter to Gillespie, the federation's president, expressing the department's desire to move forward with the elimination of rank-specific locker rooms in early June, 2001. Roach offered the federation the opportunity to discuss the matter. The federation accepted the offer for discussion by means of a letter dated May 16, 2001, from Nolan. Contemporaneously, the department also initiated meetings on the issue of rank-neutral locker rooms with the Boston Police Patrolmen's Association, the patrol officers' union. On June 7, 2001, representatives of the department and the federation met to discuss the subject, but there was no resolution of differences. On June 19, 2001, Gillespie sent Sullivan a letter stating the federation's position that negotiations regarding the rank-neutral locker room policy remained ongoing and reiterating the federation's understanding that superior officer locker rooms would not be eliminated in station D-4, pending the outcome of those discussions.

In early January of 2002, Jenkinson, after being promoted to the rank of sergeant in December of 2001, was transferred to district station E-13 in Jamaica Plain. While station E-13 had a

female superior officer locker room, Jenkinson found the locker room was used as a second male superior officer locker room instead. She complained to Captain Robert Flaherty, her commanding officer, who informed her that use of the space would not be changed and that she would be given a locker in the female patrol officers' locker room. Realizing that the female superior officer locker room issue affected individuals and stations other than King and B-3, the federation forwarded a grievance on behalf of Jenkinson. The department responded only by discussing implementation of the rank-neutral locker room policy. Subsequently, Flaherty unilaterally removed the male superior officers from the female superior officer locker room, and assigned the space to female officers without regard to rank.

There being no progress to its satisfaction, the federation filed with the Massachusetts Commission Against Discrimination (MCAD) a complaint for gender discrimination against the defendant on behalf of King and Jenkinson. The department agreed to meet again to seek a resolution to the matter; however, Commissioner Evans conceded that, upon the filing of that complaint, he took steps to have the rank-neutral locker room policy implemented on a department-wide basis. On March 29, 2002, department and federation representatives met on the locker room issue for the second time, without a resolution. Five days later, Roach wrote to Gillespie, stating that the federation had declared the negotiations regarding rank-neutral locker rooms at an impasse, and indicating that the department would move toward implementing its plan for the elimination of all superior officer locker rooms. Nevertheless, he reported that implementation was "not imminent" because negotiations between the department and the patrol officers' union remained ongoing. Although the federation disputed that it had declared that the parties were at an impasse, as well as that the parties indeed had reached an impasse, it did not respond directly to Roach's letter.

Later in 2002, Stuart filed a complaint with the MCAD alleging gender discrimination. Stuart then was a sergeant assigned to district station A-1. That station had not been equipped with a female superior officer locker room at any time, and Stuart, who was uncomfortable with having to share locker room space with officers whom she supervised, often avoided use of the facility altogether.

In a letter sent by facsimile dated February 10, 2003, the patrol officers' union canceled a scheduled meeting that had been called to continue negotiations with department representatives regarding the proposed rank-neutral locker room policy. The patrol officers' union canceled because it had "been notified that the topic of female superior officer locker rooms is the subject of pending litigation between the [defendant] and the [federation]." On the following day, King, Jenkinson, and Stuart withdrew their pending complaints at the MCAD and filed suit against the defendant in the Superior Court alleging both gender discrimination and retaliation.[8]

On February 12, 2003, there appeared in the Boston Herald newspaper an article entitled "Police officers' union sues city for sex discrimination" and discussing the plaintiffs' pending lawsuit. That same morning, at a monthly meeting held with all of the commanding officers of the department, then superintendent-in-chief Hussey made specific mention of the Boston Herald article and ordered all district commanders to eliminate male and female superior officer locker rooms within ten days. The plaintiffs thereafter sought a preliminary injunction staying the department's plan to eliminate rank-specific locker rooms. A judge of the Superior Court withheld action on the request when the department agreed not to go forward with the plan pending the outcome of the within litigation. In return, the plaintiffs agreed that they would not seek damages with respect to any period subsequent to the date of that agreement.

2. *Gender discrimination.* The plaintiffs' claim for unlawful employment discrimination invokes G. L. c. 151B, § 4(1), as appearing in St. 1989, c. 516, § 4, which states in relevant part that "[i]t shall be an unlawful practice . . . [f]or an employer, by himself or his agent, because of the . . . sex . . . of any individual . . . to discriminate against such individual . . . in terms, conditions or privileges of employment . . . ." In analyzing discrimination claims brought under G. L. c. 151B, we rely on the three-stage analytical framework of *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792, 802-804 (1973). See *Wheelock College* v. *Massachusetts Commn. Against Discrimination,* 371 Mass. 130, 134-137 & n.5 (1976); *Matthews* v.

---

[8]See G. L. c. 151B, § 9.

*Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 128 (1997); *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 116-118 (2000); *Sullivan* v. *Liberty Mut. Ins. Co.*, 444 Mass. 34, 40-41 (2005); *Bray* v. *Community Newspaper Co.*, 67 Mass. App. Ct. 42, 43 (2006). "In stage one, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. In stage two, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for its actions. Finally, in stage three, the burden shifts back to the plaintiff to show that the employer's articulated reason is not the true reason, but rather a pretext." *Powers* v. *H.B. Smith Co.*, 42 Mass. App. Ct. 657, 660-661 (1997) (citations omitted). "[I]f successful in stage three, . . . 'the plaintiff is entitled to recover for illegal discrimination under G. L. c. 151B.' " *Id.* at 661, quoting from *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 444-445 (1995).

The motion judge concluded that the plaintiffs failed to satisfy their burden of proffering evidence that, if believed, would make out a prima facie case of gender discrimination, and granted summary judgment accordingly. Thus, the case at this stage turns not on the defendant's ability to produce evidence of a legitimate reason for its action, or on the plaintiff's ability to persuade that the reason is a pretext, but only on the initial question whether the plaintiffs have established "a reasonable expectation of proving each element of a prima facie case of gender discrimination." *Beal* v. *Selectmen of Hingham*, 419 Mass. 535, 544 (1995). This burden is not onerous. See *Sullivan*, 444 Mass. at 45. See also *Che* v. *Massachusetts Bay Transp. Authy.*, 342 F.3d 31, 38 (1st Cir. 2003), quoting from *Kosereis* v. *Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003) ("small showing" needed, which can be "easily made"). Given the frequent absence of direct evidence of an employer's discrimination, summary judgment is generally "a disfavored remedy" because "the ultimate issue of discriminatory intent is a factual question." *Blare*, 419 Mass. at 439.

To establish a prima facie case of gender discrimination in an employment context, the plaintiffs must of course show that they are members of the protected class, which they plainly have done. They must also demonstrate that they have been subjected to an adverse employment action by their employer, see *Sullivan*,

444 Mass. at 39, and the principal question on this appeal is whether they have done so. In addition, they are required to present at least some evidence that would warrant a finding that a discriminatory animus was at work in bringing about the adverse employment action. See *Bray,* 67 Mass. App. Ct. at 45. Put differently, there must be a showing that the challenged action "occurred in circumstances that raise an inference of unlawful discrimination." *Sullivan, supra* at 45. That the department for an extended period provided male superior officers with rank-specific locker room space, while denying the same to female superior officers even after they complained, would appear to satisfy that criterion, thus leaving in dispute only whether the failure to provide female superior officers with rank-specific locker rooms rises to the level of an adverse employment action for purposes of the Commonwealth's antidiscrimination law.

The term "adverse employment action" does not appear in the statute. General Laws c. 151B, § 4(1), as appearing in St. 1989, c. 516, § 4, renders it an unlawful practice for an employer, on the basis of various reasons, including gender, "to discriminate against [an employee] in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification." Cases have employed the phrase "adverse employment action" to refer to the effects on working terms, conditions, or privileges that are material, and thus governed by the statute, as opposed to those effects that are trivial and so not properly the subject of a discrimination action. See *MacCormack* v. *Boston Edison Co.,* 423 Mass. 652, 662-663 (1996); *Ritchie* v. *Department of State Police,* 60 Mass. App. Ct. 655, 665 (2004). Material disadvantage for this purpose arises when objective aspects of the work environment are affected. There must be "real harm"; "subjective feelings of disappointment and disillusionment" will not suffice. *MacCormack, supra* at 664. "[V]ague and impressionistic elements have no place in defining the standards for legal intervention in the often fraught and delicate domain of personnel relations." *Bain* v. *Springfield,* 424 Mass. 758, 766 (1997). See *Bray,* 67 Mass. App. Ct. at 44 (objective harm must be shown).

Title VII of the Civil Rights Act of 1964, the Federal cognate of G. L. c. 151B, contains in 42 U.S.C. § 2000e-2(a)(1)

(2000) language that is virtually the same as that set forth in G. L. c. 151B, § 4(1). We thus have looked to Federal court decisions under Title VII as guides in the interpretation of G. L. c. 151B. See *Beal*, 419 Mass. at 546. Those Federal decisions emphasize that a successful claim of employment discrimination requires a showing that the plaintiff has been subjected to some adverse action that is material. See, e.g., *Blackie* v. *Maine*, 75 F.3d 716, 725 (1st Cir. 1996) ("in virtually any other employment discrimination case premised on disparate treatment, it is essential for the plaintiff to show that the employer took a materially adverse employment action against him"). Like the courts in the Commonwealth, Federal courts have held that a materially adverse action requires more than trivial, subjectively perceived inconveniences. See *Bowman* v. *Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000) ("de minimis employment actions are not materially adverse and, thus, not actionable"); *Fairbrother* v. *Morrison*, 412 F.3d 39, 56 (2d Cir. 2005), quoting from *Terry* v. *Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (adverse employment action "is one which is 'more disruptive than a mere inconvenience . . .' "). Nor is an action materially adverse if it merely affects de minimis aspects of an employee's work. "Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Blackie, supra.*

The defendant supports the decision of the motion judge by characterizing rank-specific locker rooms as, "at most, an incidental aspect of employment." In arriving at his conclusion that the benefit in question was not among the "terms, conditions or privileges" of employment, see G. L. c. 151B, § 4(1), the deprivation of which would constitute an adverse employment action under the statute, the judge appears to have relied primarily on two undisputed facts: that no female officer was deprived of appropriate, sanitary, and gender-specific locker room facilities; and that the parties' collective bargaining agreement did not require that the department provide rank-specific locker room space. We think that these factors by themselves are not sufficient to overcome other evidence that would support a finding that such space is a material condition or privilege of employment in these circum-

stances, and consequently the factual dispute regarding its importance must be resolved by a fact finder.

We reach this conclusion because we believe that on this record a finding regarding the materiality of the benefit at issue cannot be made as matter of law. This often is the case. As both the United States Court of Appeals for the First Circuit and our own State courts have recognized, the reference in G. L. c. 151B, § 4(1), to " 'terms, conditions or privileges' is pretty open-ended language . . . and a number of cases have extended coverage to slights or indignities that might seem evanescent." *Trustees of Health & Hosps. of Boston, Inc.* v. *Massachusetts Commn. Against Discrimination,* 65 Mass. App. Ct. 329, 334 n.5 (2005), *S.C.,* 449 Mass. 675 (2007), quoting from *Randlett* v. *Shalala,* 118 F.3d 857, 862 (1st Cir. 1997). "Determining whether an action is materially adverse necessarily requires a case-by-case inquiry . . . cast in objective terms." *Blackie,* 75 F.3d at 725.

It follows that the question whether a condition or privilege of employment is sufficiently material to that employment to be the subject of an adverse employment action often cannot be answered in the abstract. Rather, the answer, while turning on objective considerations, nonetheless is tied to the specifics of the employment situation. Here, the plaintiffs have presented evidence that the denial of a rank-specific locker facility deprives them of a material feature of their employment. While such a finding may not be compelled, it would be permissible and thus precludes summary judgment on the issue.

There is evidence that the department has provided rank-specific locker rooms for decades. Even while the events underlying this proceeding took place, the department opened three district stations that were constructed with separate male and female superior officer locker rooms. A fact finder could draw a reasonable inference that the department believed for an extended period that such facilities were of at least some importance.

In addition, there is evidence that the locker rooms serve an employment function beyond that of merely being a place to dress. Separate locker rooms alleviate potential tensions between superior officers and the patrol officers whom they are required to supervise and discipline. They provide also a psychological

buffer zone for patrol officers who use their locker rooms as a place to decompress, without official scrutiny, after performing a shift that can be stressful and intense. Locker rooms may be a significant location for union organizing and collective action, a particularly relevant factor in this instance given that patrol officers and superior officers are members of different unions. See *Transcon Lines*, 235 N.L.R.B. 1163, 1165 (1978), remanded for new remedy by *NLRB* v. *Transcon Lines*, 599 F.2d 719 (5th Cir. 1979); *Sweet Street Desserts, Inc.*, 319 N.L.R.B. 307, 312 (1995).

The department is a paramilitary organization that relies upon a chain of command with respect to its operations. Its conscious failure to provide female superior officers with locker rooms that are separate from those used by female patrol officers, when male superior officers are universally provided with that benefit in each district station, could well be construed by subordinates as devaluing, and therefore undermining, the rank and authority of those female superior officers. Such perceptions would be exacerbated by the undisputed fact that the department remains a heavily male-dominated organization.

The plaintiffs' case that they have suffered an adverse employment action is not rendered insufficient by the undisputed fact that a requirement regarding rank-specific locker rooms has not been included in the parties' collective bargaining agreement. As Federal law recognizes, an employer's usual and customary provision of an unwritten or nonmandated "benefit" can constitute a "condition or privilege" of employment. See, e.g., *Hishon* v. *King & Spalding*, 467 U.S. 69, 76-77 (1984) (regular expectation that an associate attorney will be considered for partner can be construed as a condition or privilege of employment under Title VII); *Blackie*, 75 F.3d at 726 ("under certain circumstances an employer's inaction can operate to deprive an employee of a privilege of employment that an employee had reason to anticipate he would receive; in those situations, the deprivation constitutes an adverse employment action"); *Randlett*, 118 F.3d at 862 (consistently awarding permanent transfers due to hardship "a common enough practice and so arguably a 'privilege' of employment"). "A benefit that is part and parcel of the employment relationship may not be doled out in a discrim-

inatory fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all." *Hishon, supra* at 75.

In addition, we have recognized that a "collective bargaining agreement is not necessarily limited to the terms of the written document." *Boston* v. *Labor Relations Commn.*, 48 Mass. App. Ct. 169, 173 (1999). See *Lynn* v. *Labor Relations Commn.*, 43 Mass. App. Ct. 172, 177 (1997) ("a unilateral change in past practice, if it bears on terms and conditions of employment, violates the duty under §§ 6 and 10(*a*)(5) [of G. L. c. 150E] to bargain such changes collectively with the employee's representative"). Particularly given the holding of the Labor Relations Commission "that providing lockers to police officers and the manner in which they may be used is a benefit amounting to a condition of employment that constitutes a mandatory subject of bargaining," *Shrewsbury*, 28 M.L.C. 44, 45 (2001), the absence of language within the collective bargaining agreement mandating the provision of superior officer locker facilities does not by itself preclude a finding that rank-specific facilities are conditions or privileges of a superior officer's employment.[9]

3. *Retaliation.* General Laws c. 151B, § 4(4), inserted by St. 1946, c. 368, § 4, declares that it shall be an unlawful practice for "any person, employer, labor organization or employment agency to . . . discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five." Section 4(4A), inserted by St. 1989, c. 722, § 14, provides that it shall be unlawful for "any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or

___

[9]The plaintiffs rely on *Wedow* v. *Kansas City*, 442 F.3d 661, 671-672 (8th Cir. 2006), for the proposition that an employer's action regarding restrooms, changing areas, and shower facilities affects material employment benefits as matter of law, and that consequently partial summary judgment should have been entered in their favor with respect to the prima facie case. The extreme facts of that case, see *id.* at 667-668, make the decision of little value in deciding the present case.

protected by this chapter." These sections, read separately or together, essentially proscribe retaliation against those who exercise their rights under G. L. c. 151B and against those who assist or advocate for them. Pursuant to these provisions, the federation alleges that the defendant retaliated against its male members for their support of their female colleagues by eliminating the benefit of rank-specific locker rooms that the male members traditionally had enjoyed.[10]

To establish such a claim, the plaintiffs are required to show that (1) they engaged in legally protected conduct; (2) they suffered an adverse employment action; and (3) there existed a causal relationship between their protected conduct and the adverse action that was visited upon them. See *Pontremoli* v. *Spaulding Rehabilitation Hosp.*, 51 Mass. App. Ct. 622, 625 (2001); *Ritchie*, 60 Mass. App. Ct. at 665. The judge concluded that the evidence was insufficient to warrant findings in the plaintiffs' favor on either the second or third element, i.e., that they had been subjected to an adverse employment action or that the action causally was related to their complaints regarding the absence of rank-specific locker facilities. We believe otherwise. On our own review of the record, there is sufficient evidence to create genuine disputes of material fact whether the department's plan to eliminate superior officer locker rooms altogether was an adverse employment action for purposes of G. L. c. 151B, § 4(4) and (4A), and whether the plan was adopted to retaliate against male superior officers for supporting the female superior officers' complaints.

We already have concluded that the evidence permits a finding that an adverse action affecting the "terms, conditions or privileges of employment," G. L. c. 151B, § 4(1), took place.[11] As we indicated, there is evidence that the provision of rank-

---

[10]The plaintiffs have not pursued on appeal their earlier allegation that the department's action was undertaken to retaliate against the female plaintiffs as well.

[11]We acknowledge the plaintiffs' argument that a claim of retaliation under G. L. c. 151B, § 4(4) or (4A), does not require the kind of adverse employment action necessary for a claim of discrimination under G. L. c. 151B, § 4(1), but instead is satisfied merely by a showing that some detrimental action occurred in response to the employees' assertion of protected rights. See *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 57-58, 63-64 (2006). Because we decide that the plaintiffs have offered evidence sufficient

specific locker rooms is a long-standing privilege accorded to superior officers and that such facilities are relevant to the conditions of those officers' employment. We turn then to the question whether there is sufficient evidence to establish a causal relationship between the plaintiffs' attempts to enforce their rights and the department's decision to eliminate rank-specific locker rooms altogether.[12]

In granting summary judgment to the defendant, the motion judge determined that the plaintiffs' allegation of retaliation was unsupported because the plaintiffs "ignore the fact that the [department] had proposed implementing such a policy in May of 2001, nearly two years before the plaintiffs' complaints before the MCAD or in the Superior Court." That may be true, but this determination fails to take into account that the department began entertaining changes in the traditional practice shortly *after* the federation first forwarded a grievance on the subject. The forwarding of that grievance was a protected activity for purposes of a retaliation claim. Contrast *Mole* v. *University of Mass.*, 442 Mass. 582, 592-594 (2004). See G. L. c. 151B, § 4(4) ("unlawful practice for . . . employer . . . to . . . otherwise discriminate against any person because he has opposed any practices forbidden under this chapter"); *Abramian*, 432 Mass. at 121 (letter to chief of security served as exercise of protected activity); *Ritchie*, 60 Mass. App. Ct. at 664-665, quoting from MCAD Guidelines: Sexual Harassment in the Workplace § IX.A (2002) ("complaining to management or filing an internal complaint" constitutes protected activity).

Furthermore, the department has admitted that it would not have considered a rank-neutral policy had it not been for King's original grievance. Even absent the admission, we recognize

to permit a finding of an adverse employment action under § 4(1), they have satisfied § 4(4) and (4A) in this regard as well, and it is unnecessary to determine whether a lesser showing would have been adequate.

[12]There appears to be no dispute that the retaliation claim does not depend on the success of the plaintiffs with respect to the discrimination claim. In other words, the plaintiffs could fail with respect to their claim of gender discrimination under G. L. c. 151B, § 4(1), yet prevail on their allegation of retaliation under G. L. c. 151B, § 4(4) and (4A). See *Smith* v. *Winter Place LLC*, 447 Mass. 363, 364 n.4 (2006).

that a permissible inference of retaliation may be drawn from an adverse action taken "in the immediate aftermath of the employer's becoming aware of the employee's protected activity," or "[w]here adverse employment actions follow close on the heels of protected activity." *Mole*, 442 Mass. at 592, 595. Thus, a fact finder on this record permissibly could conclude that the department's plans and attempts at implementation in station D-4, coming as they did two months after the federation forwarded King's grievance to the department, were in fact caused by, and a response to, that grievance.

Even were we to consider the MCAD and Superior Court filings as the protected activity, there are genuine disputes of material fact regarding the purposes of subsequent department action. There is evidence that the defendant did not undertake any effort after May of 2001 to eliminate superior officer locker rooms until January, 2002, after King and Jenkinson had filed their complaint with the MCAD. Commissioner Evans testified that he postponed plans to adopt the rank-neutral locker room policy until bargaining with the federation was complete, "[b]ut with the MCAD complaint, I moved to implement male and female [rank-neutral locker rooms], period."

There is evidence as well that the department responded to the plaintiffs' filing in Superior Court by ordering, on the very next day, that all district stations eliminate superior officer locker rooms within ten days. Notable also was superintendent-in-chief Hussey's reference to the Boston Herald article that made public King's and Jenkinson's complaints of gender discrimination. While a fact finder could conclude that the department's actions were designed to eliminate what was perceived to be a discriminatory practice, we think a fact finder also supportably could find that the department intended to retaliate against the male superior officers for supporting the complaints of their female union colleagues. See *Mole*, 442 Mass. at 592. The question is not susceptible in any event to resolution on summary judgment.

4. *Disposition.* The judgment entered on counts I (gender discrimination) and II (retaliation) of the complaint is vacated, and the case is remanded to the Superior Court for further

proceedings consistent with this opinion. The order denying the plaintiffs' motion for summary judgment is affirmed.

*So ordered.*