NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-106                                        Appeals Court

KATHRYN DOWNEY  vs.  EARL JOHNSON[1] & another.[2]

No. 22-P-106.

Suffolk.    April 10, 2023. – July 3, 2024.

Present:  Milkey, Massing, & Henry, JJ.

Employment, Sexual harassment, Discrimination, Retaliation.
     Anti-Discrimination Law, Employee, Sex, Prima facie case.
     State Police.  Practice, Civil, Summary judgment.

Civil action commenced in the Superior Court Department on
June 15, 2018.

The case was heard by Robert B. Gordon, J., on motions for
summary judgment.

Leonard H. Kesten for the plaintiff.
Erica Morin, Assistant Attorney General, for Department of
State Police.
David J. Officer for Earl Johnson.

HENRY, J.  The plaintiff, Kathryn Downey, a former

defensive tactics instructor at the State police academy

_____

[1] Individually and in his official capacity.

[2] Department of State Police.

(academy) appeals from a summary judgment entered in the Superior Court in favor of the defendants, the Department of State police (State police) and fellow trooper and academy instructor Earl Johnson, on Downey's claims of discrimination and retaliation.  See G. L. c. 151B, § 4; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (Title VII).[3]  We vacate that portion of the summary judgment related to Downey's claims under G. L. c. 151B and Title VII premised on a theory of disparate treatment.  In all other respects, the summary judgment is affirmed.

Background.[4]  Johnson and Downey were troopers assigned to the academy as defensive tactics instructors.[5]  The two became romantically involved in 2015.  As described further below, the relationship ended abruptly in June of 2016, as a result of events that are pertinent to this appeal.

1.  The hard drive complaint.  Johnson was the defensive tactics training coordinator responsible for the curriculum.  On

---

[3] Downey waived her intentional inference claims below.

[4] We recite the facts in the light most favorable to Downey, the nonmoving party, reserving some details for later discussion.  See Yee v. Massachusetts State Police, 481 Mass. 290, 292 (2019); Noviello v. Boston, 398 F.3d 76, 81-82 (1st Cir. 2005).

[5] Of the thirty or so defensive tactics instructors at the academy around this time, only three were women, inclusive of Downey.

June 27, 2016, Downey entered Johnson's unlocked office at the academy to access training materials -- a "not uncommon" occurrence for Downey and other academy instructors.  While there, she noticed a personal credit card bill on Johnson's desk that included a charge for a May 31, 2016, hotel stay.  Downey was unsure why Johnson would have needed a hotel room, as Johnson was on duty that day and had slept at Downey's home that evening.

When Downey returned to the academy for an overtime shift later that same day, she went to Johnson's office for a second time to look for a training checklist.  There, she retrieved for that purpose a portable, external hard drive (hard drive) that Johnson had attached to his State police computer.  Although the hard drive was Johnson's personal property (and thus used to store personal materials), Johnson also used it to store work-related materials and, as such, had regularly allowed his coworkers access to the hard drive in the past.  Downey carried the hard drive to her assigned workstation, plugged the hard drive into a State police computer, and began searching for the training materials that she needed.  During her search, Downey discovered a folder containing sexually explicit photographs and video footage of, among other things, Johnson masturbating and

engaging in sexual activity with other women.[6]  Downey had never come across pornography on the hard drive in the past.  Downey copied the files she thought were inappropriate onto a flash drive.  After discussing the contents on the hard drive with Johnson later that evening, Downey ended their romantic relationship.

A few days later, Downey found, in her travel bag, an iPad tablet computer belonging to Johnson that he had asked her to return.  After Johnson indicated that personal photographs of her might be stored on the iPad, Downey powered it on to check.  Due to the iCloud cloud storage service function on Johnson's phone, his web activity displayed on the iPad, and Downey saw that Johnson had been visiting pornographic websites and a website called "Adult Friend Finder."  When Downey confronted Johnson, he expressed that "he might be a sex addict."  Downey contends that Johnson subsequently admitted to her that he had met a woman at a hotel for sex on May 31, 2016, consistent with the credit card bill Downey had seen on his desk, and during the timeframe that he would have been on duty.

---

[6] At her deposition, Downey testified that it was "possible" that the sexually explicit materials on the hard drive were in one "folder" labeled "trash," and that the folder was organized into multiple subfolders, some of which were organized by women's names and some by body parts.  The folder labeled "KD" that she opened contained photographs of herself ("nothing unclothed"), which she deleted.  In total, Downey opened about a dozen files.

Acting on the advice of the State police employee assistance unit, Downey contacted Lieutenant Colonel Thomas Grenham, the sexual harassment officer, to express her concern about what she had found on Johnson's hard drive and iPad. During their meeting, Grenham, who was also the commander of the division of standards and training (division), advised Downey to submit a written complaint, which she did on July 12, 2016, detailing the course of events that led to the discovery of the "pornographic images and videos" on the hard drive and Johnson's iPad.[7]  Downey also alleged that Johnson admitted to having sex with another woman during the May 31 hotel stay, and expressed the possibility that Johnson may have been on duty at the time of the tryst.

On July 19, 2016, Johnson was temporarily transferred out of the academy, effective July 24, 2016, pending an investigation; Downey remained at the academy.  On July 21, 2016, Detective Lieutenant Mary McCauley was assigned to investigate Downey's complaint.[8]  McCauley's investigation included a review of the files that Downey had copied from the

---

[7] On July 7, 2016, the same day that Downey met with Grenham, then-Captain Kerry Gilpin, the executive officer of the division, was dispatched to the academy to "secure items from . . . Johnson's [academy] office."  Gilpin removed computers and equipment from Johnson's office.

[8] Downey retained her present counsel at this time and was represented going forward.

hard drive, a search of Johnson's office, and an analysis of Johnson's State police desktop computer, user logon identification, e-mail, and web activity information. McCauley did not examine the hard drive itself, because Johnson "refused to produce [it] for examination." McCauley interviewed only Johnson and Downey because "[a]lthough it would have been relevant to assess whether other [defensive tactics] staff besides [Downey] had also used the [hard drive], a decision was made to limit witness interviews to [Downey and Johnson]."

During the investigation, Johnson "confirmed Trooper Downey's version of events that she had immediately confronted [Johnson] . . .; that he cheated on her; that she was accurate in her assumption that he stayed in a hotel with someone else; and that she had, as reported, found pictures of him with other women stored on [the hard drive] located in his [academy] office." Johnson also admitted to McCauley that he had told Downey he "must be a sex addict" to get Downey to "back the pressure off of demanding answers from me." In addition, Johnson admitted that he had stayed in a hotel with someone on the afternoon of May 31, 2016; that he had his marked cruiser with him; and that he thought it was after his 7 A.M. to 3 P.M. shift, but it was possible that he had checked in earlier than 3 P.M.

McCauley's January 13, 2017, report stated:  "This officer developed no evidence to confirm whether or not Trooper Johnson would have still been on shift when he went to the hotel, so that particular allegation could not be investigated further." There is no indication that McCauley checked the hotel's records or the credit card statement, or asked other personnel about Johnson's whereabouts that day.  McCauley's report also made "no conclusions about Trooper Johnson's use of web-based email services, or his affiliation with adult dating services."

McCauley recommended that Downey's complaint be sustained, concluding that Johnson had violated State police policy by (1) failing to log off the network when leaving his State police computer unattended for extended periods, (2) allowing other employees to have access to his State police computer through his account, (3) connecting a personal hard drive to the State police computer and network while knowing that the hard drive contained "materials inappropriate for the workplace," and (4) storing shirtless "selfies" of himself on the State police desktop computer.[9]  After reviewing McCauley's report, Captain David DeBuccia, the internal affairs section commander, also

---

[9] Several photographs had been deleted from Johnson's desktop computer at 8:30 P.M. on July 6, 2016, hours before Downey met with Grenham (timing McCauley called "suspect"), and were recovered from the recycle bin of Johnson's State police computer during the forensic examination.

recommended to Grenham and Major David Otte, the deputy commander of the division, that the charge therein be sustained. Otte concurred in that conclusion as well as the disciplinary recommendations. On April 18, 2017, Johnson was informed that he was being permanently transferred out of the academy where he had been assigned for approximately ten years. Johnson was very unhappy about the transfer.

2. The taser incident. On the same day that Johnson received notice of his permanent transfer from the academy, he circulated a draft complaint against Downey to three current State police employees and one retired member, in violation of State police policy.[10]

Three days later, on April 21, 2017, Johnson filed a written complaint about Downey with Grenham. Johnson's complaint alleged that thirteen months earlier, in March of 2016, Downey aimed her taser at him while they and two other defensive tactics instructors, State police Troopers Steven Wohlgemuth and David Lahair, were cleaning up the gym after a taser training session. Unbeknownst to Johnson, however, Downey had loaded her taser with an "inert" or "training" cartridge

_____

[10] Pursuant to an April 23, 2009, State police general order, troopers must "[i]mmediately" report all potential incidents of workplace violence "to their immediate supervisor." None of the recipients of the draft complaint was Johnson's supervisor.

that had been altered to look like a "live" cartridge and so that the barbs would bounce off the targeted individual.[11] Downey deployed the taser, hitting Johnson in the hip and abdomen before the blunt metal pieces bounced to the ground. Johnson was not wearing protective equipment at the time.[12] Johnson contended that he had not reported the taser incident earlier because, among other reasons, he did not want to jeopardize the then-new taser program, and he could monitor Downey's behavior as an instructor going forward to "preempt any future lapses in her judgment."  He also alleged that after he left the academy, other members of the defensive tactics staff had relayed that Downey had been exhibiting "erratic behavior, such as mood swings, emotional outbursts, and verbal arguments with fellow instructors."  Johnson reported that he had witnessed this type of "volatile" behavior previously "on

---

[11] The inert cartridge used by Downey had a black cover to look like a live cartridge, and the probes had been cut off, guaranteeing it could not stick to the target.

[12] Although Johnson contended that he suffered a couple of small bruises, roughly the size of a "dime" or a "quarter," Downey has consistently disputed that contention, noting Johnson had never mentioned an injury and she had observed none.  In addition, Wohlgemuth testified that Johnson never complained thereafter that the incident "was harmful in any way." Wohlgemuth added that he had been hit with thousands of inert cartridges, including in the neck and hands, but had never sustained a bruise.  Lahair also testified that he had never sustained an injury from being tased.  The State police's investigation concluded that there was "no evidence of injury documented," but that Downey's conduct nonetheless had "the potential to cause serious injury."

occasion" as well as a "negative attitude" by Downey toward her students that had led to complaints. Johnson indicated that if "Downey were to have another incident like the one perpetrated on [him,] [he] would feel at least partially responsible for any injuries or damages that might result." As a result of Johnson's complaint, Downey, Wohlgemuth, and Lahair were restricted from teaching certain defensive tactics at the academy.

On April 23, 2017, Johnson shared his complaint, using State police letterhead, with Axon Enterprises, Inc. (Axon),[13] "requesting that Trooper Downey's instructor certification be revoked."

Five days after Johnson filed a written complaint with Grenham, Detective Lieutenant Carla Pivero was assigned to investigate Johnson's complaint.[14] Pivero interviewed Downey, Johnson, Wohlgemuth (twice), and Lahair (twice), and, among other things, reviewed training schedules, e-mails, and the

---

[13] Axon was "formerly known as TASER International, Inc." Ramirez v. Commonwealth, 479 Mass. 331, 339 n.4 (2018).

[14] Pivero was subsequently tasked with investigating complaints that (1) Johnson had filed the taser complaint in retaliation for Downey's earlier complaint; (2) Johnson had failed to timely report an incident of workplace violence; and (3) Johnson had shared improperly his complaint outside the State police.

taser activity records for Downey and Johnson.[15]  Downey admitted to firing the taser, but explained that she had intended only to "prank" Johnson; that the prank was Wohlgemuth's idea and that he had showed her earlier on the day of the incident how he had altered inert cartridges to look like live ones; and that Wohlgemuth provided the altered cartridge used in the prank. Downey also said that she and Wohlgemuth discussed the prank with Lahair in advance.  For his part, Wohlgemuth admitted that he had altered taser cartridges for training purposes and that one of these cartridges was used by Downey; however, he denied providing the altered cartridge to Downey.[16]  Both he and Lahair denied having prior knowledge of or involvement in the plan. Downey, Wohlgemuth, and Lahair reported to Pivero that all four troopers laughed at the time.  Indeed, Lahair reported that immediately after being struck, Johnson had exclaimed, "[W]hoa, nothing happened, I feel like Superman."  Wohlgemuth also heard the Superman reference.  The incident was discussed afterwards

---

[15] After interviewing Johnson, Pivero obtained and reviewed student survey results for the entire eighty-second training troop, confirming Johnson's representation that "on the rare occasion" the instructors received a negative comment from students, he would "often see" that Downey was the subject of the complaint.

[16] Under the State police rules and regulations, troopers are not permitted to modify any use of force equipment or parts without the authorization of the armorer.

among the instructors in a humorous context.  During his interview with Pivero, Johnson claimed for the first time that the incident was dangerous and egregious and caused a "psychological impact," and he alleged other behavioral issues by Downey.[17]  Downey, through her attorney, and Wohlgemuth both expressed that they believed Johnson's complaint was in retaliation for Downey's prior complaint against Johnson. Wohlgemuth also testified that Johnson's contacting of Axon (the taser company) was "payback."

In a written report dated September 12, 2017, Pivero recommended that the charge against Downey be sustained, concluding that Downey engaged in misconduct by improperly deploying her taser.  Pivero found that, although Wohlgemuth admitted to altering taser cartridges and that Downey used one of the cartridges he altered, he and Lahair were not involved in the taser incident other than as witnesses; Downey's "uncorroborated and disputed testimony" led Pivero to "discount Trooper Downey's credibility in her statement" as compared to

---

[17] Johnson alleged that Downey did not get along with the other instructors, interjected her opinions that were inconsistent with the overall training program, did not seem to take the training as seriously as some of the other instructors, exhibited an "abnormal sense of humor," was a "source of dissention and disagreement in the unit," and refused "to accept the way things were done and want[ed] to do things her way." Johnson further alleged that several instructors relayed to him other incidents of Downey "acting unprofessionally."

Wohlgemuth's and Lahair's denials. Pivero recommended that the retaliation complaint against Johnson not be sustained, concluding that there was "insufficient evidence to prove or disprove" the charge. Although she found Johnson's timing to be "suspect," she concluded that "retaliation [wa]s difficult to prove," where, among other things, Johnson provided explanations for his delay. Pivero also found that there was sufficient evidence to sustain the charge that Johnson improperly shared his complaint outside the State police, and accordingly, recommended that the charge of employee misconduct be sustained.[18]

DeBuccia reviewed Pivero's investigative summary and made the same recommendations to Grenham and Otte. After reviewing Pivero's report himself, Otte also concluded that the charge against Downey should be sustained and recommended that Downey be removed from the academy and prevented from instructing on use of force equipment. Otte also agreed with Pivero's assessment that Wohlgemuth and Lahair were not involved in planning the taser incident; he concluded, however, that the two had failed to appreciate their duties and responsibilities and, as such, he recommended that Wohlgemuth and Lahair receive

---

[18] For reasons left unexplained, Pivero did not make any findings with respect to the complaint charging Johnson with failure to timely report workplace violence.

letters of counselling.[19]  Finally, although Otte found the timing of Johnson's complaint to be "highly suspect," he concurred with Pivero that the retaliation charge should not be sustained.[20,21]

On October 17, 2017, Downey was permanently transferred out of the academy and assigned to patrol, effective October 22, 2017.[22]  Downey appealed her discipline to the State police trial

_____

[19] The letters of counselling are not in the record.  Downey disputes that they were given.  In any event, the letters were "nondisciplinary."

[20] Otte acknowledged the likelihood that Johnson's complaint was motivated, at least in part, by a desire to retaliate against Downey, and explained that nonetheless, the State police "had a clear obligation to investigate" Johnson's complaint "and take immediate corrective action."  Due to certain "mitigating circumstances," however, including "the timing of [Johnson's] complaint," and the large number of State police members that have been tased as part of training, Otte recommended that Downey be disciplined "at or below the lower end of the disciplinary guidelines."

[21] Otte also recommended that the charges against Johnson for failing to timely report workplace violence and the improper dissemination of information be sustained, though he recommended "mitigat[ing] any discipline" for "late reporting" of workplace violence to avoid potentially "chilling" other would-be complainants from coming forward.  Otte recommended that Johnson receive a letter of reprimand, or "perhaps even a loss of accrued time" for the two sustained complaints.  Downey disputes whether Johnson was disciplined for disclosing his complaint outside of the department to Axon.  The record does not contain a written reprimand of Johnson for this disclosure.

[22] After Downey's transfer, she was promoted to sergeant in 2018, to lieutenant in 2019, and to lieutenant detective in 2020.  None of these promotions was discretionary; they were either based on promotional examinations or consolidation of units.

board (trial board).[23]  The trial board found Downey "guilty" of one violation of State police rules (unsatisfactory performance) by deploying the taser and recommended that Downey be issued a written reprimand and be restricted from instructing defensive tactics "for a period of time determined by the Colonel." Colonel Kerry Gilpin, who had become the State police Superintendent, adopted the trial board's finding and recommendations, with two exceptions.  First, Gilpin disagreed with the trial board's characterization of the incident as a "prank and not an egregious safety issue."  Second, she rejected the trial board's recommendation that Downey be barred from defensive tactics instruction.  Downey eventually received a letter of reprimand.

3.  The Grenham rumor.  On September 25, 2017,[24] Downey submitted a letter to the highest-ranking officers in her chain of command at the time, Colonel Richard McKeon and Lieutenant

---

[23] Under the State police rules and regulations, a trial board "shall enter a determination of 'Guilty' or 'Not Guilty' for each charge/specification."  Massachusetts State Police Rules and Regulations § 6.7.8 (2001).  See Burns v. Commonwealth, 430 Mass. 444, 448 n.6 (1999) ("The board appears analogous to a military court martial board").

[24] The statement of undisputed facts dates the letter September 17, 2017, but this appears to be a typographical error as the cited support is the September 25, 2017, letter.  Nothing turns on this discrepancy.

Colonel Francis Hughes, alleging that Johnson and others had retaliated against her for reporting Johnson to superiors (rumor complaint). Downey complained that days after Pivero issued her September 12 report, rumors began to circulate that Downey was involved in a sexual relationship with Grenham. At the time, Grenham was one of the senior officers in the division who would review Pivero's report and make recommendations about discipline for Downey. Downey requested that the State police investigate the source of the rumors and expressed her suspicion that it was Johnson. Downey also claimed that the Boston Globe newspaper had been "informed" of the rumor. Grenham also learned of the rumors. In fact, during the investigation of his complaint, Johnson had expressed his concern to Pivero that Downey would not be "disciplined commensurate with [her] actions" by "senior command staff." The timing of the rumor coincided with when Grenham would be reviewing Pivero's report and making recommendations, and it could have affected that process.[25] The next day, on September 26, 2017, before any investigation had occurred, Downey received a negative supervisory report for filing the rumor complaint "out of [her] chain of command."[26]

---

[25] For example, it could have goaded Grenham into recusing himself or being harder on Downey than he might otherwise have been.

[26] The State police policies and procedures permit reports of retaliation to be made to any "supervisor." McKeon and

On October 5, 2017, Downey and her attorney met with Captains Brian Moran and Lee Gullage to discuss these concerns. This meeting was not recorded unlike previous meetings with investigating officers. Thereafter, Moran testified that he and Otte conducted a data-mining search of all work e-mails to see if the source of the rumor could be located, but no evidence related to the alleged rumor or its source was found. No official investigation was ever opened, and no interviews were conducted. Other than the e-mail search, the State police did not conduct any additional investigation. Moran's alleged report of the investigation submitted to Otte has never been produced, and the results of any investigation were never communicated to Downey.

Discussion. Downey appeals from the judgment in favor of the defendants on her claims of hostile work environment, disparate treatment, and retaliation.

1. Standard of review. "Summary judgment is granted where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law." Ng Bros. Constr. v. Cranney, 436 Mass. 638, 643-644 (2002). In reviewing the grant of summary judgment, we "review the evidence in the

---

Hughes were Downey's supervisors. When Downey obtained a copy of her full personnel file, the negative report was not contained therein, and the State police have never produced it.

light most favorable to the party against whom summary judgment entered," here Downey (citation omitted). Adams v. Schneider Elec. USA, 492 Mass. 271, 280 (2023). We draw all reasonable inferences in her favor. See id. at 288; Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 38 (2005). "Our review on summary judgment is de novo." Yee v. Massachusetts State Police, 481 Mass. 290, 294 (2019).

2. Claims. a. Hostile work environment sexual harassment. To prevail on this claim under G. L. c. 151B, § 4 (16A), Downey has the burden of establishing, among other things, that "the conduct alleged was both 'subjectively offensive' and 'sufficiently severe and pervasive to interfere with a reasonable person's work performance'" (citation omitted). Gyulakian v. Lexus of Watertown, Inc., 475 Mass. 290, 296 (2016). See Muzzy v. Cahillane Motors, Inc., 434 Mass. 409, 411-412 (2001). A hostile work environment is one "pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, pos[ing] a formidable barrier to the full participation of an individual in the workplace." College-Town, Div. of Interco, Inc. v. Massachusetts Comm'n Against Discrimination, 400 Mass. 156, 162 (1987) (College-Town).[27] Downey's claim founders on these requirements.

_____

[27] The standards applicable to Title VII hostile work environment claims are analogous to G. L. c. 151B standards.

First, no jury reasonably could find on this record that Downey's discovery of sexually explicit images on the hard drive on one occasion created a hostile work environment within the meaning of the statute.[28] Johnson did not leave his pornography displayed openly such that Downey was required to view it, and, as Downey concedes, Johnson never intended for Downey to view the images. Rather, in the course of accessing the training materials on the hard drive, Downey opened files that one could tell (from their titles) had nothing to do with defensive tactics training.

---

See Brisette v. Franklin County Sheriff's Office, 235 F. Supp. 2d 63, 84-85 (D. Mass. 2003) (approach taken by Supreme Judicial Court does not differ greatly from United States Supreme Court's analysis). See also Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-23 (1993); Forsythe v. Wayfair Inc., 27 F.4th 67, 72 (1st Cir. 2022) (court noted that plaintiff did not dispute that if her Title VII failed as matter of law, so did her c. 151B claim). Where Downey analyzes the claims together and does not point out any material differences in the standards, our conclusion that her c. 151B claims related to a hostile work environment on this theory failed as a matter of law therefore extends to her Title VII claims.

[28] Downey alleges two other acts of harassment by Johnson that contributed to a hostile work environment. Even if Johnson's tryst in the hotel in May 2016 with another woman occurred during work hours, Downey was not exposed to this behavior in her workplace. Johnson made his admissions about using the "Adult Friend Finder" website and his possible sex addiction during an offsite lunch he had agreed to attend when Downey wanted to talk about their personal relationship. Given the positive workplace relationship between Downey and Johnson until she discovered his perfidy and then pornography, Johnson's acts and his admissions were too attenuated from the workplace to support an actionable hostile work environment claim.

To be sure, Downey's discovery of the pornography on the hard drive and the fact that Johnson had cheated on her made her uncomfortable in the workplace.  Downey immediately broke up with Johnson and did not want to be around him.  After Downey's discovery, her contact with Johnson was "minimal."[29]  Johnson's conduct was not sufficiently severe and pervasive to interfere with a reasonable person's work performance.

Second, Downey contends that the State police's liability for Johnson's conduct depends on the "factual" question whether Johnson was Downey's supervisor or merely a coworker, and that it was error for the judge to resolve that question in favor of Johnson's coworker status on summary judgment.  We disagree.  To be sure, the question whether Johnson was Downey's supervisor can properly be considered "factual."  But that factual question was not disputed.  Johnson testified before the trial board that he was not Downey's supervisor.  Downey did not point to any evidence of record indicating otherwise, nor did she even allege or argue before this appeal that Johnson was her supervisor.  In short, Downey failed to "respond[] to the defendants' evidence with any countervailing evidence that would indicate there is a genuine issue of material fact" as to whether Johnson was her

---

[29] Johnson was on leave for National Guard training in early July 2016 and on his return was transferred out of the academy.

supervisor.  Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 467 (1997).

Downey contends that even if Johnson was not her supervisor, the State police can still be held liable for his conduct.  It is certainly true that "an employer who is notified of sexual harassment in the workplace and fails to take adequate remedial action violates G. L. c. 151B, § 4."  College-Town, 400 Mass. at 167.  See Noviello v. Boston, 398 F.3d 76, 95 (1st Cir. 2005) (employer can be held liable under Title VII for coworker-perpetrated harassment on "showing that the employer knew or should have known about the harassment, yet failed to take prompt action to stop it").  It is undisputed, however, that the State police promptly responded to Downey's complaint by (1) temporarily transferring Johnson out of the academy; (2) notifying Downey of her rights and the process for filing a sexual harassment complaint and investigating her allegations; and (3) as a result of that investigation, permanently transferring Johnson out of the academy.  Importantly, Downey does not suggest that Johnson's transfer failed to remediate the concerns that she had raised to the State police, nor is there any evidence in the record from which one can infer that the State police's actions, in their totality, were anything other than "adequate steps to remedy the situation."  College-Town, supra at 163.  For example, Downey does not contend that the

behaviors about which she had complained continued after Johnson's transfer, nor is there any other evidence in the record indicating that, if Johnson's conduct constituted harassment in the first instance, the State police's response was not "reasonably calculated to end and deter any further harassment."  Modern Cont./Obayashi v. Massachusetts Comm'n Against Discrimination, 445 Mass. 96, 110 (2005).  See id. at 113 (removing potential harassers from complainant's "immediate work area" sufficient response, especially where "there was no form of sexual harassment perpetrated thereafter").

Downey argues that she should prevail all the same because the motion judge erred in concluding that the investigation was "prompt, fair, and thorough."  And, as she contended to the motion judge, McCauley relegated Downey's complaint about Johnson's misconduct to a "failed personal relationship with a coworker" and found that Downey accessed a device (the hard drive) that "clearly did not belong to her."  Although it is true that "the failure to remedy alleged discrimination . . . can arise where the employer purports to investigate the discrimination, but does so in an inadequate manner," Gyulakian, 475 Mass. at 301-302, we are aware of no case (and Downey points to none) holding that an employer can be liable for an inadequate investigation that nonetheless results in adequate remedial action against the alleged harasser.  Liability under

G. L. c. 151B does not lie for flawed business judgment, investigative shortcomings, and personnel mistakes. See Sullivan, 444 Mass. at 56. Rather, liability arises for discriminatory animus in the employment decision. See Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 128, 134 (1997).[30] Even accepting Downey's contentions that the investigator asked her "humiliat[ing]" questions, made "improper" comments, and was not as thorough as she ought to have been, for Downey's claim of a hostile work environment, the upshot is that the State police promptly took actions designed to remediate the concerns that Downey had raised.[31] Contrast Gyulakian, supra at 293, 301-303 (alleged harasser not disciplined after notice to management and inadequate

---

[30] As for Title VII, Downey's claim fails because she cannot establish that the State police "knew or should have known about the harassment, yet failed to take prompt action to stop it" (quotation and citation omitted). Forsythe v. Wayfair Inc., 27 F.4th at 73. Title VII "does not ensure against inaccuracy by an employer, only against . . . discrimination." Rivas Rosado v. Radio Shack, Inc., 312 F.3d 532, 535 (1st Cir. 2002).

[31] Downey argues that the investigation here was lacking because the investigator (1) "humiliated" Downey by making her "describe the images on the hard drive" (and Downey notes that the investigator did not ask Johnson to do so); (2) made "improper" comments about Downey accessing a device that did not belong to her and Downey's "failed personal relationship with a co-worker"; and (3) did not review the hard drive or investigate whether Johnson had checked into the hotel while on duty. Though these arguments cannot defeat summary judgment on the hostile work environment claim, they may be relevant to her claim of disparate treatment. See infra.

investigation); College-Town, 400 Mass. at 167-168 (same). As noted supra, there is no evidence in the record that those actions were ultimately ineffective. Under those circumstances, summary judgment in favor of the State police on Downey's claim of a hostile work environment was proper.

b. Disparate treatment discrimination based on gender. Downey contends that she was treated less favorably than her male counterparts in connection with the State police investigations of employee misconduct and the imposition of discipline. Lacking direct evidence of discriminatory animus and causation, Downey, as was her right, elected to use the modified McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973), paradigm to defeat summary judgment. See Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 396-397 (2016); Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 680-683 (2016).

Under the burden-shifting paradigm, Downey had the initial burden of establishing a prima facie case of discrimination. The elements of a prima facie case are intended to be flexible and vary depending on the specific facts of the case. See Sullivan, 444 Mass. at 42. The burden is "not intended to be onerous." Id. at 45. To meet her prima facie burden on the theory of her case here, Downey was required to show that she was a member of a protected class, she suffered an adverse

employment action, and "she was treated differently from another person, known as a comparator, who was not a member of her protected class, but who otherwise was 'similarly situated'" (citation omitted). Trustees of Health & Hosps. of Boston, Inc. v. Massachusetts Comm'n Against Discrimination, 449 Mass. 675, 682, 687 (2007) (Trustees) (disparate treatment of employees in implementation of layoff procedure violated G. L. c. 151B, § 4 [1]).[32],[33] See Molloy v. Blanchard, 115 F.3d 86, 91-92 (1st Cir. 1997) (female police officer established prima facie case of gender discrimination in Title VII case by establishing, among other things, that similarly situated male officers received more lenient treatment in discipline). Whether an individual is a sufficiently similar comparator for purposes of this analysis depends not on whether their circumstances are identical, but on

---

[32] Downey argues that the judge's iteration of the prima facie elements was incorrect because he considered comparator evidence at stage one instead of stage three of the paradigm. That argument is at odds with the Trustees case, where the Supreme Judicial Court considered comparator evidence in the first stage. See Trustees, 449 Mass. at 682. We recognize that in Matthews, the Supreme Judicial Court considered comparator evidence at the third stage, perhaps because the defendant did not challenge whether the plaintiff met his prima facie case. See Matthews, 426 Mass. at 129. This difference is not material to our analysis.

[33] Plaintiffs can prove their prima facie case without comparator evidence if they have other proof of discrimination. See Trustees, 449 Mass. at 682-683 (plaintiffs proceeded on alternative theories, one requiring comparator evidence and one not).

whether they are similar "in all relevant aspects" (citation omitted).  Trustees, supra at 682.  "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. . . .  Exact correlation is neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples" (citation omitted). Id.

Here, the State police does not contest Downey's satisfaction of the first two elements.  As for the third element, Downey offers two possible comparators:  Johnson and Wohlgemuth.[34]  The motion judge rejected that each was sufficiently similar to Downey for purposes of this analysis. We disagree.

i.  Johnson as comparator.  First, Downey offered evidence from which a reasonable jury could conclude that she and Johnson were "similarly situated" but were nonetheless "treated differently" (citation omitted).  Trustees, 449 Mass. at 682. Specifically, Downey produced evidence that she and Johnson were accused of serious violations of State police policy -- Downey for firing her taser containing a modified cartridge at an unprotected Johnson, and Johnson for storing illicit materials

_____

[34] At oral argument, Downey's counsel clarified that Downey was not asserting Lahair as a comparator.

on the hard drive that he connected to the State police network, leaving the entire State police computer network unsecured, and potentially not working his full shift or engaging in sexual activity while on duty. Both troopers held the same rank and assignment to the academy. They were members of the same class at the academy and had clean disciplinary records at the time of their respective complaints against each other. While their offenses are by no means "identical," a reasonable jury could conclude that they were "of comparable seriousness." Matthews, 426 Mass. at 130.

Downey also put forth evidence from which a jury could infer that, despite their similarities, Johnson and Downey were treated differently. First, there is a dispute of fact over whether Johnson received a letter of reprimand for his report to Axon and others in violation of State police policy. See note 21, supra.

Second, assuming the ultimate punishments imposed were the same (a transfer from the academy and a letter of reprimand), a reasonable jury could conclude that the State police did not conduct an investigation of all of Johnson's alleged misconduct, but did of Downey's. For example, even though Johnson admitted to investigators that it was possible that his tryst at the hotel occurred while he was on duty, and had candidly admitted privately to Downey that it was, there is no evidence in the

record that the State police checked the hotel or Johnson's credit card records, or interviewed his coworkers as to his whereabouts that day. Similarly, the State police did not review the hard drive, although there were questions about the folder name or names where the pornography was stored. The State police confined the interviews to Johnson and Downey, even though coworkers in the academy who had access to the hard drive might have provided valuable information on the scope of Johnson's misconduct. In contrast, there is evidence that the State police inquired of every third party implicated in Johnson's taser complaint and checked records for both Downey and Johnson's taser activities.

Moreover, Johnson admitted that after he was involuntarily transferred from the academy, he spoke to other academy instructors about Downey. That alone should have been a moment of concern for the State police about whether Johnson was attempting to harass Downey. Johnson then made comments about Downey to the State police that potentially epitomized sexual stereotyping (relaying that after Johnson left the academy, Downey had been exhibiting "erratic behavior, such as mood swings, emotional outbursts, and verbal arguments with fellow instructors"). Instead of determining whether Johnson was potentially subjecting Downey to classic sexism or even speaking to the other instructors, the State police obtained survey

results for an entire training class to confirm Johnson's comment that "on the rare occasion" the defensive tactics unit received a negative survey comment from students, he "would often see that comment generated regarding Trooper Downey's instruction." And, in finding that there was "insufficient" evidence of retaliation to sustain the retaliation charge against Johnson, all State police officers involved in the investigation concluded that "retaliation is hard to prove" rather than evaluate the evidence. They did so notwithstanding the timing of the complaint, the sexist attitudes Johnson displayed in his justifications for not making a timely report, and the evidence from "credible" witness Wohlgemuth that Johnson submitted the taser complaint and contacted Axon to retaliate against Downey. See Verdrager, 474 Mass. at 399-400 (conduct by supervisors reflective of "[s]tereotypical thinking," in conjunction with other evidence of disparate treatment, could support allegations of discrimination [citation omitted]).

For reporting the retaliation and rumor to the highest-ranking State police officers at the time, as permitted by State police rules, the State police immediately gave Downey a negative supervisory report. A fact finder could conclude that Johnson, in contrast, received no discipline at all for the sustained charge of improperly sharing State police documents

with an outside party, even though he had a "conviction" on his record by that point.[35]

A jury also could find that the State police did not conduct an investigation into Downey's rumor complaint and that the State police's explanation for not opening an investigation of Johnson in connection with the rumor complaint was not true.[36] There was evidence that the State police did not follow its written rules and regulations pertaining to investigations and discipline. For example, under State police policy, all complaints must be investigated. Based on the facts of record, including the lack of any recording as occurred in all other investigations and the failure to produce the final report from the investigating officers (as well as the negative supervisory report issued to Downey), a jury could find that no meaningful

---

[35] The State police prosecutor consolidated the two sustained charges of improper dissemination of the draft complaint and failure to report the workplace violation into a single charge of unsatisfactory performance. Otte recommended that any discipline for Johnson's thirteen-month delay in reporting the violence should be "mitigated" because Johnson was a "victim," and Otte was concerned about the chilling effect on other employees who have knowledge of workplace violence but are afraid to report it.

[36] Moran testified that he and Otte had "grave difficulties" in arriving at "some reasonable premise" to investigate Johnson as the source of the rumor. A jury could find that this was not credible. Aside from the rumor potentially being retaliatory because Johnson believed Downey would be treated favorably by supervisors, Grenham was due to review the Pivero report and the rumor could have succeeded in causing Grenham to recuse himself from that review.

investigation into Downey's rumor complaint to McKeon and Hughes ever occurred. The "'failure to follow established procedures or criteria' . . . [may] support a reasonable inference of intentional discrimination." Bulwer, 473 Mass. at 687, quoting Nesbitt v. Holder, 966 F. Supp. 2d 52, 56 (D.D.C. 2013).

The above evidence was sufficient to create a genuine issue of material fact whether Johnson and Downey were similarly situated but nonetheless treated differently. See Butler v. Prairie Village, 172 F.3d 736, 750 (10th Cir. 1999) ("evidence that other employee harassment complaints were handled in a more thorough and systematic fashion" was evidence of disparate treatment that helped "satisf[y] . . . [p]laintiff's prima facie case"). Downey therefore met her burden as to her use of Johnson as a comparator. See Trustees, 449 Mass. at 685-687 (by adopting procedure for all employees being laid off, plaintiffs were similarly situated in all relevant aspects to comparators outside protected classes who were fully or partially exempted from harsh layoff procedure).

ii. Wohlgemuth as comparator. Downey also raised a genuine issue of material fact concerning whether she and Wohlgemuth were "similarly situated" for purposes of meeting her prima facie burden. It is undisputed that Wohlgemuth admitted to tampering with some use-of-force equipment -- taser cartridges. This was a potential violation of State police

rules and regulations, yet Wohlgemuth was not investigated or charged with misconduct. The record also reveals a dispute of fact about whether Wohlgemuth was disciplined for not reporting the taser incident. Downey also offered sufficient evidence from which a jury could conclude that the State police's determination that she was not truthful about Wohlgemuth being the architect of the taser incident was not reasonable and itself was an unreasonable determination rooted in sexism.[37] This conflicting evidence goes directly to the heart of whether Wohlgemuth's conduct, as the alleged architect behind the taser incident, was "roughly equivalent" to Downey's as the ultimate perpetrator (citation omitted). Trustees, 449 Mass. at 682.

iii. Stages two and three. Downey does not challenge the State police's satisfaction of its non-onerous, second-stage burden. See Yee, 481 Mass. at 302 (to meet second-stage burden, employer must simply articulate a "lawful reason backed by some credible evidence"); Joseph v. Lincare, Inc., 989 F.3d 147, 158

___

[37] The State police report of its investigation "discount[ed]" Downey's testimony as "uncorroborated and disputed" and credited the testimony of the men. While the State police had no obligation to credit Downey, a jury can consider the reason Downey's testimony was not credited. Given that one person's testimony, if believed, suffices to support a criminal conviction beyond a reasonable doubt, Commonwealth v. Santos, 100 Mass. App. Ct. 1, 6 (2021), a jury could find that for a law enforcement agency's decision to discount a woman's testimony as "uncorroborated and disputed" by male employees is disparate treatment.

(1st Cir. 2021) (in Title VII case employer's burden at stage two is one of production, not persuasion, and can be met by articulating nondiscriminatory reason for adverse employment action).  See also Bulwer, 473 Mass. at 683 n.12.

Turning to the third stage of the paradigm, we conclude that Downey's evidence, "taken as a whole rather than viewed in isolation" (citation omitted), Bulwer, 473 Mass. at 684, was sufficient to create a material dispute that the reasons given for the different treatment of Downey were pretextual.  In addition to helping her satisfy her prima facie case, Downey's evidence that similarly situated male employees were treated more favorably is "[t]he most probative means of establishing . . . pretext."  Matthews, 426 Mass. at 129.  Genuine issues of fact exist regarding the State police's good faith belief for disciplining Downey and not disciplining the male comparators, precluding summary judgment.[38]  See Bulwer, 473 Mass. at 683.  A reasonable jury could interpret the comments and actions of the State police here "as reflecting stereotypical thinking" that

---

[38] "Massachusetts is a pretext only jurisdiction," meaning that a "plaintiff need only present evidence from which a reasonable jury could infer" that the reasons given for an employer's actions were not the real ones (citation omitted).  Bulwer, 473 Mass. at 681.  Claims under Title VII require "a plaintiff to demonstrate that the employer's stated reasons are [in fact] a pretext for concealing a discriminatory purpose."  Adams v. Schneider Electric USA, 101 Mass. App. Ct. 516, 525 n.20 (2022), S.C., 492 Mass. 271 (2023).

resulted in disparate treatment (quotation and citation omitted).  Id. at 684.  Similarly, for Title VII purposes, Downey has submitted sufficient evidence that the State police's stated reasons are a pretext for concealing a discriminatory purpose.  The disparate treatment claims should have been submitted to a jury.

c.  Retaliation.  To establish retaliation, Downey must show that the "protected activity was a but-for cause of the alleged adverse [employment] action" -- the discipline for the taser incident (citation omitted).  Theidon v. Harvard Univ., 948 F.3d 477, 506 (1st Cir. 2020) (elements of retaliation claim under Title VII).  See Psy-Ed Corp. v. Klein, 459 Mass. 697, 707 (2011) (elements of retaliation claim under G. L. c. 151B).  She must also show that "the employer's desire to retaliate against the employee must be shown to be a determinative factor in its decision to take adverse action."  Id. at 704.  Downey cannot make this showing.

Even if Johnson had a retaliatory motive for reporting the taser incident, the State police independently investigated, and Downey admitted that she fired an inert taser cartridge at Johnson and that she did not act in accordance with her taser training when she did so.  Regardless of Johnson's motives, the State police had an interest as an employer in disciplining Downey's as an employee for her conduct, because it could have

resulted in injury whether it was a prank or workplace violence. Nothing in this record indicates the employer was manipulated by Johnson. See Adams, 492 Mass. at 273 (acknowledging "cat's paw or innocent pawn theory of liability" under Massachusetts law).

That leaves the question whether Johnson could be liable for retaliation even where the employer was not. To be sure, G. L. c. 151B, § 4 (1),

> "applies by its terms only to an 'employer.' . . . Nonetheless, individuals, whether supervisors, fellow employees, or third parties, also may be held liable by provisions that forbid 'any person . . . to . . . interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter,' G. L. c. 151B, § 4 (4A), and that prohibit 'any person, whether an employer or an employee or not, to aid [or] abet . . . the doing of any of the acts forbidden under this chapter.' G. L. c. 151B, § 4 (5)." (Citation omitted).

Verdrager, 474 Mass. at 396. See Lopez v. Commonwealth, 463 Mass. 696, 713 (2012) (aiding and abetting under § 4 [5] is derivative claim dependent on underlying act of principal offender). Because Downey's briefing on this question does not rise to the level of appellate argument and the issue is waived. See Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 482 Mass. 1628 (2019).

Conclusion. We vacate that portion of the summary judgment related to Downey's claims under G. L. c. 151B and Title VII premised on a theory that the State police engaged in disparate treatment by treating Downey less favorably than Johnson,

Wohlgemuth, or both.  In all other respects, the summary judgment is affirmed.

So ordered.